No. 24-40571

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

STATE OF TEXAS; STATE OF ALABAMA; STATE OF ARKANSAS; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF IOWA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF MISSOURI; STATE OF NORTH DAKOTA; STATE OF OHIO; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TENNESSEE; STATE OF WYOMING; STATE OF IDAHO,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, in his official capacity as Secretary for DHS; UR MENDOZA JADDOU, in her official capacity as Director of USCIS; TROY MILLER, in his official capacity as the Acting Commissioner of CBP; PATRICK J. LECHLEITER, in his official capacity as the Acting Director of ICE; OFFICE OF MANAGEMENT AND BUDGET; SHALANDA YOUNG, in her official capacity as the Director of the Office of Management and Budget,

Defendants-Appellees,

OSCAR SILVA PEREZ; NATALIE TAYLOR; SALVADOR DOE; JUSTIN DOE; CARMEN MIRANDA ZAYAS; RICARDO OCAMPO HERNANDEZ; JESSIKA OCAMPO HERNANDEZ; FODAY TURAY; JAXHIEL TURAY; GENARO VICENCIO PALOMINO; CINDY SIQUEIROS MADUENA; COALITION FOR HUMANE IMMIGRANT RIGHTS,

Movants-Appellants,

## MOTION TO VACATE EXTENSION OF DISTRICT COURT STAY

EREZ REUVENI
*Senior Counsel*

KATIE J. SHINNERS
BRIAN WARD
*Senior Litigation Counsel*

JOSEPH A. DARROW
ELISSA FUDIM
ERIN RYAN
*Trial Attorneys*
*Office of Immigration Litigation*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

GERARD SINZDAK
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .............................................................................................i

INTRODUCTION AND SUMMARY ..........................................................................1

STATEMENT .........................................................................................................3

ARGUMENT ..........................................................................................................8

    A.    This Court Improperly Extended the District Court's Award of Temporary Relief ..........................................................................................8

    B.    The Extension of Relief Is Particularly Unwarranted Because Texas Has Not Established Standing to Sue, Much Less Irreparable Harm ........................................................................................12

    C.    At a Minimum, the Relief Must Be Narrowed ...........................................19

CONCLUSION ..................................................................................................... 22

CERTIFICATE OF COMPLIANCE

## INTRODUCTION AND SUMMARY

The federal government respectfully moves this Court to immediately vacate its September 11 Order, entered sua sponte, extending temporary relief entered by the district court that prevents the Department of Homeland Security from granting parole to eligible noncitizens pursuant to the process outlined in a notice entitled *Implementation of Keeping Families Together*, 89 Fed. Reg. 67,459 (Aug. 20, 2024). The Court provided plaintiffs with that injunctive relief without having determined that plaintiffs are likely to prevail on the merits, without having found that plaintiffs have established irreparable harm, and without balancing the equities. As of September 23—the date the district court's temporary relief was to expire—the Department will already have been enjoined from fully implementing the notice for 28 days and will now remain enjoined indefinitely. This unprecedented use of a federal court's equitable powers is at odds with fundamental principles governing equitable relief. And, indeed, plaintiffs themselves did not ask this Court to take the extraordinary step of indefinitely extending the relief entered by the district court. This Court's order should be vacated.

On August 20, the Department issued a notice that outlines a process through which certain noncitizen spouses and stepchildren of U.S. citizens may apply for parole—a discretionary immigration action that, for many of the covered noncitizens, may provide the opportunity to adjust their status that of a lawful permanent resident (LPR) without needing to temporarily depart the United States. *See* 89 Fed. Reg. at

67,459-62. Although the notice establishes a process for submitting and adjudicating parole requests, it does not itself confer any new eligibility for parole or change the substantive standards for the discretionary determination to grant a parole application. The notice also includes the Secretary's determination that granting parole on a case-by-case basis to the covered noncitizen spouses and stepchildren of U.S. citizens "will generally provide a significant public benefit to the United States, including to the impacted noncitizens, their families, and their communities at large by": "promoting family unity"; "strengthening the U.S. economy"; "advancing diplomatic relationships and key foreign policy objectives"; "reducing strain on limited U.S. government resources"; and "furthering national security, public safety, and border security objectives." *Id.* at 67,465.

Texas and other States filed this suit challenging the notice. At no point has any court concluded that plaintiffs have standing, are otherwise likely to succeed on the merits, or will suffer irreparable harm. Nonetheless, the district court entered temporary equitable relief—which it variously characterized as an "administrative stay," a "§ 705 stay," and a "temporary restraining order"—prohibiting the government for 28 days from granting parole through the process outlined in the notice. And then, in this collateral-order appeal, this Court—without any briefing on the question, any notice to the parties, or any determination that the preliminary-injunction factors are satisfied—indefinitely extended the district court's relief.

In short, Congress vested discretionary unreviewable parole authority in the Secretary, the Secretary established a process for exercising that authority, and the Secretary determined that using the authority would generally result in significant public benefit along multiple fronts. Now, this Court has indefinitely enjoined the use of that process, improperly intruding "into the workings of a coordinate branch of the Government," *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers), with almost no explanation or consideration of the factors that must be satisfied before a court awards the "extraordinary remedy" of a preliminary injunction, *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008).

This Court should thus vacate—or, at minimum, narrow—its extension of the district court's relief. That extension was procedurally improper and strays beyond the narrowly circumscribed appellate jurisdiction conferred by this collateral-order appeal. The relief is particularly unwarranted because plaintiffs are not regulated by the notice and have failed to demonstrate the required cognizable, imminent, and redressable injury to support their standing or provide a basis for equitable relief. And, at the least, the Court should narrow the relief entered to the State of Texas—the only plaintiff that has even attempted to show standing.

## STATEMENT

**1.** The Immigration and Nationality Act (INA) authorizes the Secretary of Homeland Security, "in his discretion," to grant "parole" to applicants for admission "temporarily under such conditions as he may prescribe only on a case-by-case basis

for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). A noncitizen who is granted parole is permitted to physically enter or remain in the United States temporarily, but parole is not an admission to the United States. Congress has provided that a noncitizen who was paroled may apply to adjust his status to that of an LPR. *See id.* § 1255(a). As discretionary determinations, parole decisions are generally not subject to judicial review. *See id.* § 1252(a)(2)(B)(ii).

The INA has long been understood to permit the granting of parole not only to noncitizens who are physically outside the United States, but also to those who are physically present in the United States but who have not been admitted. *See, e.g.*, INS Gen. Counsel, *Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens*, Legal Op. No. 98-10, 1998 WL 1806685 (Aug. 21, 1998). This conclusion follows the INA's text: the INA allows the parole of "any alien applying for admission," 8 U.S.C. § 1182(d)(5)(A), and the statute deems all noncitizens "present in the United States who ha[ve] not been admitted" to be "applicant[s] for admission," *id.* § 1225(a)(1). The grant of parole to such physically present noncitizens is referred to as "parole in place." Congress has recognized and affirmed the agency's "parole in place authority." *See, e.g.*, *id.* § 1182 note.

While parole in place is one mechanism through which a noncitizen who has not been admitted can (if otherwise eligible) pursue LPR status, it is not the only means Congress provided. Noncitizens who entered the country without admission or

4

parole can alternatively leave the country; apply for an immigrant visa abroad; and, if the visa is granted, apply for admission as an LPR. *See* 89 Fed. Reg. at 67,460.

Against this backdrop, the Department issued a notice regarding a process through which certain noncitizen spouses and stepchildren of U.S. citizens may apply for parole in place. *See* 89 Fed. Reg. 67,459. In the main, the notice does two things. First, it announces that the Department has established a process through which certain noncitizens may submit a request for parole in place. In general, to be eligible for that process, a noncitizen must have the requisite family relationship, must have been in the United States continuously since June 17, 2014 (for spouses) or June 17, 2024 (for stepchildren), and must not have any disqualifying criminal history. *See id.* at 67,460-61. Second, the notice memorializes the Secretary's determination that paroling, on a case-by-case basis, noncitizens who meet those criteria and who "merit a favorable exercise of discretion" will "generally provide a significant public benefit to the United States." *Id.* at 67,465; *cf.* 8 C.F.R. § 212.5(b) (reflecting similar determinations for certain groups of noncitizens in immigration detention, such as pregnant women and minors).

The notice does not alter the underlying statutory standards governing parole or guarantee a grant of parole for those who meet the process's eligibility criteria. Any noncitizen who may submit a request through the process outlined in the notice was already able to request parole in place from the Secretary—as may any noncitizen who is present in the country and an applicant for admission. And in adjudicating any

5

request submitted through the process, the Department "will determine," consistent with the INA, whether "a grant of parole in place is warranted based on significant public benefit or urgent humanitarian reasons" and whether "the requestor merits a favorable exercise of discretion." 89 Fed. Reg. at 67,465.

**2.** The State of Texas and 15 other States challenged the notice. *See* ROA.29-30. They primarily claim that the notice is contrary to the INA and was issued in violation of the Administrative Procedure Act. *See* ROA.63-77. Plaintiffs filed their complaint on August 23, 2024; the same day, they moved for preliminary relief against the notice. *See* ROA.96.

Three days later, before the government had provided any substantive response, the district court entered what it called an "administrative stay" of the granting of parole under the notice. ROA.527. In entering that relief, the court did not conclude that plaintiffs were likely to succeed on the merits of any claim; that they had demonstrated they would suffer irreparable harm in the absence of relief; or that the public interest and balance of the equities conclusively supported relief, much less universal relief to non-parties. Instead, the court concluded only that plaintiffs' "claims are substantial and warrant closer consideration than the court has been able to afford to date" and that immediate relief was necessary to "preserv[e] the court's ability to grant full relief to plaintiffs" if they should ultimately prevail. ROA.529-31. The court determined that it would "initially limit this stay to 14 days" but that it

could be extended for 14 additional days for good cause or longer if the parties consented. ROA.531.

On September 3, the government filed a motion to lift the stay and an opposition to further injunctive relief. The next day, the district court extended its relief—which it now characterized as a "temporary restraining order and stay"—for an additional 14 days, through September 23. ROA.737-38. In doing so, the court again did not conclude that plaintiffs were likely to succeed on the merits of their claims or that the plaintiffs had established that they would be irreparably harmed. Instead, the court concluded only that "plaintiffs' claims are serious and substantial enough" to justify temporary relief "until an expedited hearing on the motion for a preliminary injunction." ROA.735. And the court entered an expedited schedule for both preliminary and permanent relief that culminated in an "omnibus" hearing "and, if necessary, bench trial" on September 18. ROA.736-38.

**3.** Meanwhile, 11 individuals and one organization moved to intervene as defendants. ROA.256. The district court denied that motion, concluding that the federal government adequately represented proposed intervenors' interest in maintaining the notice. ROA.694-702.

The proposed intervenors filed this appeal from the denial of their motion and moved to expedite the appeal to enable a decision before the September 18 hearing. *See* Mot. to Expedite (Sept. 5, 2024). This Court granted that motion. *See* Order (Sept. 7, 2024).

On September 11, this Court set oral argument in this intervention appeal for October 10. Order (Sept. 11, 2024). Although no party had sought this relief, the Court also entered an "administrative stay" of proceedings in district court "pending a decision on the merits [of the intervention appeal] or other order of this court." *Id.* In addition, the Court sua sponte ordered that the "stay issued by the district court"— previously set to expire on September 23—"will remain in effect pending further order of this court." *Id.* This Court did not determine that plaintiffs had established standing or were likely to succeed on the merits of their claims or that the traditional equitable factors supported relief.

## ARGUMENT

### A. This Court Improperly Extended the District Court's Award of Temporary Relief

**1.** "A preliminary injunction is an extraordinary remedy" that "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22, 24 (2008). To make that showing, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20; *see also Nken v. Holder*, 556 U.S. 418, 434 (2009) (explaining that there is "substantial overlap" between those factors and the factors required for a stay).

The importance of rigorous adherence to these requirements is heightened in this case, where injunctive relief reflects an "intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers). Congress has explicitly vested the Secretary with the discretionary authority—generally insulated from judicial review—to grant parole. 8 U.S.C. § 1182(d)(5)(A). That grant of authority accords generally with Congress' recognition that Executive officials—not Article III courts—must have "broad discretion" to manage the immigration system and to balance the many and varied competing goals of the immigration laws. *Arizona v. United States*, 567 U.S. 387, 395-96 (2012).

The district court initially entered temporary equitable relief preventing the federal government from granting requests for parole submitted under the notice on August 26, 2024. The government has thus been prevented from fully implementing the notice for three weeks, and it faces the prospect of equitable relief that now continues indefinitely. And yet, to date, no court has determined that any plaintiff likely has standing to sue or is likely to succeed on the merits of any claim against the notice. Nor has any court concluded that any plaintiff has established that it will be irreparably harmed in the absence of preliminary relief.

As explained, *see supra* pp. 6-7, the district court justified its refusal to apply the traditional four-factor test on the ground that it was granting only temporary relief. Even if the court had been correct that temporary relief permits a lower showing, *but*

*see Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) ("[T]he standard for analyzing a motion for a temporary restraining order is the same as a motion for a preliminary injunction[.]"); *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); ROA.641-45, this Court could not properly extend that temporary relief without concluding that *Winter*'s factors are met. By rule, a temporary restraining order may not remain in effect for longer than 28 days without the parties' consent, *see* Fed. R. Civ. P. 65(b)(2), and any "temporary restraining order continued beyond the time permissible under Rule 65 must be treated as a preliminary injunction, and must conform to the standards applicable to preliminary injunctions," *Sampson v. Murray*, 415 U.S. 61, 86 (1974).

This Court's indefinite extension of the district court's stay flouts these principles. This Court has, in effect, granted plaintiffs a preliminary injunction. Yet the district court failed to conduct the required analysis and make the necessary findings to support such relief. Nor did this Court. Its Order did not include consideration of the factors governing the issuance of such relief, much less conclude that plaintiffs are likely to establish standing or succeed on the merits of their underlying claims or that they would suffer irreparable harm if the government continued implementing the notice. Making matters worse, the Court's order was entered without a request for such relief from any party, without any notice, and without briefing from any party regarding the underlying merits. *Cf.* Fed. R. Civ. P.

65(a) ("The court may issue a preliminary injunction only on notice to the adverse party."). The extension of the district court's temporary relief thus must be vacated.

**2.** This Court's provision of injunctive relief against implementation of the notice was particularly unwarranted in this appeal, which concerns review of the denial of a request for intervention, a collateral matter that is "completely separate from the merits of the underlying action." *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 375 (1987); *see also Valley Ranch Dev. Co. v. FDIC*, 960 F.2d 550, 555 (5th Cir. 1992) (The "denial of intervention is immediately appealable as a collateral order.").

In a collateral-order appeal, this Court's appellate jurisdiction is limited. Absent narrow circumstances not present here, a court of appeals with jurisdiction over an appealable collateral order may not exercise jurisdiction over other unrelated issues still pending in district court; otherwise, parties would be "encourage[d]" to "parlay" "collateral orders into multi-issue interlocutory appeal tickets" that would undermine the final-judgment rule. *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 49-50 (1995); *see also Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1027 (5th Cir. 2022) (noting that the exercise of pendent appellate jurisdiction in collateral-order appeals "is carefully circumscribed" (quotation omitted)).

Thus, in this appeal, this Court's jurisdiction is properly limited to review of the appealable order: the denial of the motion to intervene. That jurisdiction does not extend beyond that collateral order to encompass the underlying merits of the case,

which, by definition, are "completely separate" from the question whether intervention was properly denied. *Stringfellow*, 480 U.S. at 375. Indeed, absent circumstances not present here, it would be improper for proposed intervenors to ask this Court to review any action the district court had taken on the merits of the underlying litigation as part of a collateral intervention appeal. Moreover, the appeal of the denial of a motion to intervene can be resolved even after the district court's entry of a final judgment. *See, e.g.*, *Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1066 (9th Cir. 2018). There is no reason the district court could not have resolved plaintiffs' request for a preliminary injunction while this appeal was pending.[1] In short, in granting plaintiffs relief on the merits of their claims, this Court strayed beyond the limits of its circumscribed jurisdiction.

## B. The Extension of Relief Is Particularly Unwarranted Because Texas Has Not Established Standing to Sue, Much Less Irreparable Harm

This Court's extension of relief is especially unwarranted because no party has established standing to sue, much less the irreparable harm that would be necessary to support such equitable relief.

In an attempt to make that showing, Texas—the only plaintiff that, by plaintiffs' stipulation, will attempt to demonstrate standing and irreparable harm at

---

[1] To that end, the government would not oppose any request from plaintiffs to lift the stay of the district court proceedings to allow plaintiffs to seek a preliminary injunction while this appeal remains pending.

this point, *see* ROA.555-56—asserts that it will suffer indirect economic costs from the notice, *see* ROA.151-55, such as increased healthcare, education, and law enforcement expenditures. But that assertion fails to establish Article III standing: such indirect costs do not reflect a cognizable "injury in fact"; Texas has not established any "actual or imminent" such costs; and Texas has failed to show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotations omitted).

      **1.** As the Supreme Court's decision in *United States v. Texas*, 599 U.S. 670 (2023), makes clear, Texas's asserted downstream expenditures do not represent a cognizable injury in fact. There, as here, Texas attempted to challenge a federal policy that it asserted would cause an increase in the number of noncitizens residing in Texas, to which Texas would respond by making additional expenditures for education, healthcare, and law enforcement. *See id.* at 674. The Supreme Court rejected that theory of standing, explaining that "in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *Id.* at 680 n.3. When a State asserts "that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id.* Thus, the Court held that the plaintiffs' assertions regarding increased expenditures failed to "overcome[] the fundamental Article III problem with th[eir] lawsuit." *Id.*

Texas's theory of standing fails here for the same reason. Texas does not assert that the notice will cause it direct injury. Instead, Texas asserts that the notice will have downstream effects on the State. Relying on the predicate that the notice will result in some noncitizen residents of Texas who otherwise would have departed the United States remaining in Texas, the State asserts that following any such increase in the number of noncitizens present in the State, it will spend additional money on those noncitizens through education, healthcare, and law enforcement costs. *See* ROA.151-55. But such indirect, incidental effects are not judicially cognizable injuries.

Any contrary rule would be at odds with bedrock principles of our federal system, in which the United States and the States share sovereignty over the same territory and people. When a State suffers a "direct injury" at the hands of the federal government, it may be able to sue the United States. *Florida v. Mellon*, 273 U.S. 12, 18 (1927). But a State cannot sue the federal government based on the indirect effect of federal policies regulating the people within the State, including when the State responds by making additional expenditures. Such policies inevitably have derivative consequences for States, but deeming cognizable a State interest in avoiding such incidental effects on the exercise of its own authority is inconsistent with the autonomy of the national and state sovereigns to act directly upon individuals "'within their respective spheres.'" *Printz v. United States*, 521 U.S. 898, 920 (1997). That is particularly true where, as here, those effects derive from the independent actions of individuals.

Texas's theory of standing has startling implications. On its view, any federal action that increases, even indirectly, the number of immigrants in a State creates standing because the State may increase its expenditures in response. Other States could use equivalent logic to claim injury from any federal action reducing their noncitizen populations, on the theory that noncitizens pay state taxes or otherwise contribute economically to the State. If such incidental financial effects satisfied Article III, every immigration-policy dispute between the federal government and the States would end up in federal court. Nor is the problem limited to immigration. Indeed, because almost every federal policy will affect the people within the States, almost every policy will indirectly affect the States themselves. But if such effects satisfy Article III, "what limits on state standing remain?" *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022).

**2.** Even if such indirect effects on a State's decisions concerning the expenditure of funds could serve as a cognizable interest, Texas has failed to demonstrate the "certainly impending" increase in expenditures that would be required to establish standing, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation omitted), or establish irreparable harm, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010). Although one benefit from granting parole in place to the noncitizens who meet the criteria to use the notice's process is that those noncitizens may not be required to depart the country to pursue LPR status, the process in question applies only to noncitizen spouses who have been in the United States—

with, of course, no grant of parole—continuously for more than a decade (or to noncitizen stepchildren who have been in the United States since June 17, 2024). Although some of the covered noncitizens may have eventually chosen to depart the country and sacrifice family unity for the sake of pursuing LPR status, Texas has not shown that, absent the notice, they would do so imminently—and any such suggestion is necessarily speculative given the extended continuous presence required to qualify for the process in the notice.

Moreover, any attempt by Texas to make the required showing would run headlong into the Supreme Court's repeated admonitions that standing is more difficult to establish where, as here, "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else." *Lujan*, 504 U.S. at 562. Here, Texas's asserted chain of causation "hinge[s] on the response" of multiple other actors, *id.*: the decisions of individual immigration officers who must determine, on a case-by-case basis, whether to grant parole to any individual covered by the notice; the decisions of individual noncitizens to remain in or depart the country; the decisions of those noncitizens to engage in activities that may result in Texas's expending funds; and the decision of Texas itself to make those expenditures.

Many of the individual specific costs that Texas identifies suffer from even additional hurdles. For example, Texas complains that, in Texas, unlawfully present noncitizens pay resident tuition—rather than higher nonresident tuition—at State

universities. ROA.152. But that is a choice Texas itself has made. Moreover, Texas does not explain how the notice will result in more students paying resident tuition, rather than out-of-state tuition. Even assuming the (speculative) premise that, absent the notice, some resident noncitizens who are enrolled in Texas universities would depart the country, the presumptive outcome of such departures is that the noncitizens would cease to be enrolled in Texas universities. It is not that the noncitizens would continue to be enrolled in—and thus pay higher, nonresident tuition at—a university in a country that, by hypothesis, they have departed.

Similarly, Texas complains that it is required to pay costs associated with Emergency Medicaid and the Texas Children's Health Insurance Program to provide certain healthcare to noncitizens. ROA.152. But those requirements are imposed by other laws, not the INA's parole provision. *Cf. Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (rejecting Texas's standing to challenge one federal statute based on "a vague reference to a *different* [federal] statute that it does not challenge"). And again, Texas does not explain how the notice will result in a net increase in noncitizens using those programs. Indeed, the opposite may well be true. Noncitizens who are granted parole may also receive authorization to legally work in the United States. *See* 8 C.F.R. § 274a.12(c)(11). Thus, if the notice results in noncitizens who were already Texas residents receiving parole and ultimately employment authorization, those noncitizens may obtain private, employer-sponsored health insurance (or may otherwise become ineligible for the means-tested State-run insurance programs). As a result, the notice

17

may actually result in a net decrease in the number of noncitizens in Texas who receive healthcare funded by State-run programs.

**3.** Regardless, even if Texas could demonstrate some cognizable, certainly impending injury from the notice, Texas could not show how that injury would likely be redressed by a favorable decision. As explained, *see supra* pp. 5-6, the notice does not alter the statutory eligibility criteria for granting parole. In other words, any noncitizen eligible to use the process outlined in the notice was already able to request parole in place before the notice—and would remain so eligible even if the notice were rescinded or enjoined. And the decision whether to grant parole to any individual is explicitly committed to the Secretary's discretion—and generally not subject to judicial review. *See* 8 U.S.C. §§ 1182(d)(5)(A), 1252(a)(2)(B)(ii).

Thus, even if Texas received relief against the challenged notice, that relief would do "nothing to change the fact that federal officials possess the" underlying discretion to grant parole to all of the same noncitizens encompassed by the notice. *Texas*, 599 U.S. at 691 (Gorsuch, J., concurring in the judgment). And because any such relief "would leave officials with their" underlying statutory "discretion intact," *id.* at 693, any relief available in this suit would not suffice to redress Texas's alleged injuries, and Texas lacks standing.

## C.    At a Minimum, the Relief Must Be Narrowed

At a minimum, this Court should narrow its extension of the district court's relief to apply only to the granting of parole applications submitted by Texas residents.

Article III "limits the exercise of the judicial power to 'Cases' and 'Controversies.'" *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 438 (2017). Consistent with that limitation, a court may entertain a suit only by a plaintiff who has suffered a concrete injury and may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (quotation omitted).

Principles of equity reinforce that constitutional limitation. A federal court's authority is generally confined to the relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). And it is a longstanding principle of equity that injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Thus, English and early American "courts of equity" typically "did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring).

Those principles are reinforced here by the text and history of the APA. Section 705 itself permits a court to stay agency action only "to the extent necessary to prevent irreparable injury," 5 U.S.C. § 705, which explicitly incorporates the

constitutional and equitable limitations on non-party relief. Indeed, the legislative history of that provision makes clear that Congress intended that § 705 relief would be "equitable" and used only "to prevent irreparable injury." H.R. Rep. No. 79-1980, at 43 (1946). Thus, consistent with equitable principles, Congress understood that "[s]uch relief would normally, if not always, be limited to the parties complainant." *Id.* And, more generally, the APA makes explicit that its provisions do not affect "the power or duty of the court" to "deny relief on" any "equitable ground." 5 U.S.C. § 702(1). Therefore, the APA requires courts to decline to enter nationwide relief, however styled, where narrower relief would redress plaintiffs' injuries.

Nationwide relief—whether styled as an injunction or a stay—also creates well-catalogued legal and practical problems. Such relief circumvents the procedural rules governing class actions, which permit relief to absent parties only if rigorous safeguards are satisfied. Fed. R. Civ. P. 23. It enables forum shopping and empowers a single district judge to intrude upon litigation by other parties in other courts, and to effectively nullify the decisions of all other lower courts, by barring application of a challenged policy in any district nationwide. *Department of Homeland Sec. v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring in the grant of stay). And it "short-circuit[s] the decisionmaking benefits of having different courts weigh in on vexing questions of law" and overburdens courts' "emergency dockets." *See Arizona*, 40 F.4th at 395-98 (Sutton, C.J., concurring); *see also Texas*, 599 U.S. at 702-04 (Gorsuch, J., concurring in the judgment).

In light of those principles, the nationwide relief provided by this Court is manifestly overbroad. As explained, plaintiffs have stipulated that only Texas will even attempt to prove that it is injured by the notice, and Texas's theory of injury rests on expenditures that it alleges it will make if the notice incentivizes some noncitizen residents to remain in Texas rather than (temporarily) depart to another country. Even assuming the legal adequacy of that theory of injury, nationwide relief is not required to redress it. Texas does not—and could not plausibly—allege that it incurs those same costs when noncitizens who reside in other States choose to remain in the country. Instead, relief limited to prohibiting the Department from granting parole using the notice's process to residents of Texas would fully redress Texas's alleged harm; as a result, the entry of broader relief contravened the principles described above.

## CONCLUSION

For the foregoing reasons, the Court should vacate its extension of the district court's stay.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

EREZ REUVENI
*Senior Counsel*

KATIE J. SHINNERS
BRIAN WARD
*Senior Litigation Counsel*

GERARD SINZDAK

JOSEPH A. DARROW
ELISSA FUDIM
ERIN RYAN
*Trial Attorneys*
*Office of Immigration Litigation*
*Civil Division*
*U.S. Department of Justice*
*P.O. Box 868, Ben Franklin Station*
*Washington, D.C. 20044*

 s/ Sean R. Janda
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*
*sean.r.janda@usdoj.gov*

September 2024

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2) because it contains 5187 words according to the court of Microsoft Word. This motion also complies with the requirements of Federal Rule of Appellate Procedure 27(d) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface. The undersigned has contacted counsel for plaintiffs-appellees and movants-appellants regarding their position on this motion. Plaintiffs-appellees oppose the relief requested in this motion; movants-appellants consent to the motion to vacate the stay and take no position at this time on a hypothetical motion by plaintiffs-appellees.

*s/ Sean R. Janda*
Sean R. Janda